**UNITED STATES of America** Plaintiff

v.

**Eulric WARE** Defendant

**No. CRIM. A. 3:00CR–59–H.**

United States District Court,
W.D. Kentucky,
at Louisville.

July 13, 2001.

---

Monica Wheatley, United States Attorney's Office, Louisville, KY, for Plaintiffs' Counsel.

Stephen H. Miller, Virginia F.B. Hood, Louisville, KY, for Defendants' Counsel.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Defendant Eulric Ware seeks to suppress much of the evidence relating to his indictment for possession of cocaine. Magistrate Judge Gambill conducted a suppression hearing and issued findings of fact and conclusions of law recommending that the motion to suppress be denied in its entirety. Ware has filed numerous objections to that recommendation.

The Court departs from the Magistrate Judge's recommendation in two areas. The first concerns the validity of the supposed anticipatory warrant used to justify the search of Ware's apartment after his arrest. The second concerns whether law enforcement officers sufficiently broke off their interrogation of Defendant after he requested counsel. If not, Defendant's subsequent incriminating statements during the interrogation are inadmissible.

This Court now reviews Ware's objections *de novo*. *See United States v. Leake*, 95 F.3d 409, 416 (6th Cir.1996); 28 U.S.C. § 636(b)(1) (2000).

## I.

The Court has expanded upon the extensive factual findings of the federal magistrate judge due to the importance of the facts in this analysis. As to all but a few material facts, the parties and the magistrate judge agree.

Detective Dotson, a member of the Airport Interdiction Unit of the Louisville Metro Narcotics Unit, noticed a suspicious package early in the morning of February 8, 2000. The hand addressed and heavily taped Federal Express package was shipped overnight from Dora Reeves in Daytona Beach, Florida to David Jones in Louisville, Kentucky. Detective Dotson, a K-9 handler for Metro Narcotics, then placed the package with several other packages and examined them all with his drug dog, who was trained to signal the potential presence of controlled substances. The drug dog alerted on the David Jones package and Detective Dotson then paged Detective Nunn and took the package to the Airport Interdiction Unit's office.

When he arrived, Detective Nunn drafted a state search warrant to open the package and stated in his affidavit that the drug dog had alerted on the package, the package contained a handwritten label and was heavily taped, and the package originated from a source city of illegal narcotics. Detective Nunn also drafted a second state warrant to install an electronic tracking device in the package. In his supporting affidavit, Detective Nunn stated the following:

This Affidavit concerns a parcel, copy of the mailing label attached. I am concurrently, by separate application, requesting the issuance of a search warrant for the subject parcel. That affidavit is incorporated herein by reference and is attached. If and when that warrant is issued, I will open the parcel and conduct a field test for the presence of any controlled substance. If the test is positive, all or a portion of the substance will be removed. I, or another Metro Narcotics Detective will then, functioning as a Parcel Carrier, deliver the parcel to the designated address.

If and when the parcel is opened pursuant to a search warrant applied for by separate application, I desire to install in it a device which transmits a radio tone on Metro Narcotics Unit radios. The audible tone occurs approximately every five (5) seconds in the monitor mode. This will allow Metro Detectives and other law enforcement officers to follow the parcel if it is moved from the place of delivery before it is opened. This is necessary as the individual who accepts or receives the parcel may not be the person for whom it is ultimately intended.

The device's alarm mode will activate when the parcel has been opened and the contents removed. The alarm mode is an audible tone twice every second. Activation of the alarm mode will assist in identifying the individual to whom the parcel was intended.

Once the parcel has been opened, discovery of the electronic tracking device is highly likely. This will necessitate immediate recovery of the device and the contents of the parcel before they are destroyed, secreted, consumed and/or transported by another individual. I, therefore, desire to install for a period of three (3) days and seek authorization to enter the residence, structure, and/or vehicle of the person or persons who have custody of the parcel when the device enters the alarm mode or once the beacon transmitter ceases transmitting, as loss of a device may occur after it ceases transmitting.

The warrant gave "authority to enter any such residence, structure, or vehicle to seize the parcel and contents thereof of [sic] the beeper signals indicate that the FedEx parcel has been opened or if the device ceases transmitting." Detective Nunn attached a copy of the FedEx air bill and an affidavit from Detective Dotson stating the drug dog's training and experience as well as verifying that the dog alerted on the suspect package. A state court judge signed both warrants prepared by Detective Nunn ("the Nunn warrants") at 9:30 a.m. that morning.

After the Nunn warrants were signed, Metro Narcotics detectives then opened the package and found a shoe box with two high-top basketball shoes. Inside each shoe, the detectives found about one fourth of a kilo of what appeared to be cocaine. Field testing verified that the substance was likely cocaine. The detectives removed all but about one gram of the cocaine, installed the electronic tracking device, and resealed the package.

While the detectives prepared the package for delivery, Detective Napier drafted a search warrant ("the Napier warrant") for the residence on the package label, 1426 South First Street, Apartment 3. In the affidavit, Detective Napier stated:

[H]e has and there is reasonable and probably grounds to believe and affiant does believe that there is now on the premises ... cocaine and/or any other illegal or controlled substance observed during the legal scope of the search; also anything used to cut, measure, or weigh any such illegal or controlled substance, any financial records, profits, monies or properties derived from the sale of such illegal or controlled substances.

. . . . .

Affiant has been an officer in the aforementioned agency for a period of 13 years and the information and observations contained herein were received and made in his capacity as an officer thereof.

On the 8th day of February, 2000, at approximately 9:47 a.m., affiant received information from Detective Brian Nunn of Jefferson County Metro Narcotics that he caused a state search warrant to be executed on Federal Express parcel

# 818036600446. This package is addressed to David Jones, 1426 So. 1st Street Apt # 3, Lou., Ky. 40208. This package was found to contain approximately (1) one pound of cocaine. On 02–08–2000 a controlled delivery of this parcel will be attempted. Metro detectives will send in only a small portion of the illegal substance. This is to assure that all of the evidence is not destroyed. All of the above occurred in Louisville, Jefferson County Kentucky.

Acting on the information received, affiant conducted the following independent investigation:

— A check in the crisscross does not specify which apartments tenants are associated with.

A different state court judge signed the Napier warrant at 10:07 a.m.

That morning the detectives attempted a controlled delivery to the address listed on the parcel. Detective Dotson, dressed as a FedEx courier, made the first delivery attempt. After knocking on the door and receiving no response, a tenant of another apartment stated that "Ricco" was in school and would be back later in the day. Detective Dotson returned to attempt delivery again at 2:35 that afternoon, and Ware answered the door. Ware accepted the package by signing "David Jones" and returned to his apartment.

After a few minutes, Ware left his apartment, looked around the apartment and the street, and left in his car. After a very short time, Ware returned to the apartment. A few minutes later, Ware repeated this same behavior, looking around and going for a short drive. Given the short nature of his drive, the detectives concluded that he drove around the block to look for any surveillance or police activity. Ware then left the apartment carrying a Lazarus department store bag, got in his car, and drove south on First Street. At the same time, the surveillance officers notified the detectives that the beacon transmitter was being moved. Detectives Nunn and Napier followed Ware south.

The detectives followed Ware to Third Street, where he suddenly stopped his car and scrutinized those cars that drove past, including the vehicle of Nunn and Napier. Ware then drove to the University of Louisville and pulled into a semi-circular driveway in front of a campus building. Unmarked police vehicles blocked Ware's car from both sides and officers removed Ware from his car and placed him face down in the street. The officers then frisked and handcuffed Ware and Detective Napier read Ware his *Miranda* rights. Detective Nunn then saw the Lazarus bag sitting on the rear seat of the car. He opened the door and removed the bag, finding the unopened FedEx package inside.

The officers then brought Ware back to his apartment on South First Street. The officers did not obtain consent to search the apartment. Instead, they relied on the Napier warrant.[1] Eight officers searched the two bedroom apartment and removed items from both bedrooms and the common areas. Officers seized a seventy-ounce digital scale, a ten-pound scale, and four boxes of "baggies" from the kitchen;

---

1. Though the warrant return indicates that the officers searched the apartment at 1:20 p.m., over an hour before the second, successful controlled delivery attempt, testimony at the suppression hearing indicated that the search occurred at 3:20 p.m. Detective Napier, the officer recording the items seized, evidently confused 13:20, military time for 1:20 p.m., for 3:20 p.m. On portions of the warrant return, Detective Napier altered many of the 13's to become 15's, changing the time from one o'clock to three o'clock. The time recorded on other portions of the warrant return reflect unchanged 15's and unchanged 13's.

"personal papers" from the west bedroom; "personal papers" and a Crown Royal bag that the drug dog alerted on from the east bedroom; and an assault rifle with two magazines and three boxes of ammunition from the closet in the east bedroom. During the search, Ware stated that the east bedroom was his, disavowed ownership of the rifle and ammunition, and indicated that the scales were used for cooking.

After the search, Detectives Nunn and Napier took the objects seized to the property room at police headquarters while Detective Pitcock transported Ware to headquarters for booking. Detective Pitcock then radioed Detectives Nunn and Napier to inform them that Ware wanted to speak with them to find out what he could do to help himself.

After coming to Ware's location, Detectives Nunn and Pitcock placed Ware in a statement room alone for approximately fifteen minutes. During this time, another officer began videotaping Ware through a one way mirror. Detectives Nunn and Pitcock then entered the room and began to talk to Ware. Though they never advised him that the statement was being recorded, an audio recorder was on the table in the room. Detective Nunn read Ware his *Miranda* rights again and asked Ware if he understood those rights. Ware replied that he was a little "hazy" about what they meant and Detective Nunn then asked him "to concentrate" because these were his rights and he was under arrest. Nunn then continued, "would you like me to read [your rights] to you again? Or would you like to read em? These are very, very important to you."

Ware asked Nunn to read the rights again, Nunn did so, and the conversation continued. Because this conversation is so critical to this case, the Court recites it at length:

> Ware: So, right now I can have an attorney while I talk to y'all?

Nunn: Sure can, that's your legal right.

Ware: Do I get a chance to counsel with him before I talk or do I just or he just come . . .

Nunn: Oh no, we wouldn't do anything until you talked to a lawyer. That's kinda what I told you back at the apartment when I told you, the last thing I told you, we're not here to jack you around. I feel very confident that we have a very solid case on you and that's why I told you at the apartment, I'm not going to twist your arm, I'm not going to jump up and down. What I told you was if you go on to jail, make sure you get ahold of a lawyer and then immediately have that lawyer call us because this is what we do every day, we do parcels, I mean stuff that comes in the mail, FedEx, UPS, U.S. Mail Service. That's our game and we're real good at it and we got a real good case on you. That's why I was saying that if you need to do that, then you need to do that.

Ware: Can I just tell one of y'all [inaudible] still talk on the record?

Nunn: We can do anything you want to.

Ware: I'd just rather have an attorney, man.

Nunn: Who, well, who, the thing is we don't provide them, that's what I'm saying, we can give you a phone book, uh, and hopefully find you a telephone.

Ware: You don't have a public defender or nothing like that?

Nunn: We can give you a phone book, normally, we don't have a number we can call. What they do is the public defender is appointed for you when you go to arraignment in court.

Ware: I mean, I mean that's kind of, I don't know anybody. I can't afford one.

Nunn: Well, this is totally your call. I, I, want you to know what you're doing and I want you to do what's best for you. We can get you a deal if you want to go that route.

Pitcock: The P.D.'s office should be in here, should be in the blue pages.

Nunn: It is, but there's nobody there. I mean we have a P.D.'s office, it's in there. Here's what I can do. Starting right here are the attorneys. [Nunn holds up yellow pages]

Ware: I don't know. Like I said, I don't want to call nobody that I don't have no money to do anything.

Nunn: Well, the attorneys ...

Ware: (inaudible)

Pitcock: I mean the thing is if you want an attorney and you talked to them, it ain't like we can make one appear. You got a right to one, you can have one, we can provide you with the numbers, but I just can't snap my fingers and make one appear.

Ware: Yeah, yeah, I got that. Yeah, I know that.

Nunn: I can give you all that. [Holding up attorneys section of yellow pages.]

Ware: I just, I don't, shoot man. The only attorney I ever knew was, oh, there is this building, right, I know this Wendy's, there's a lot of attorneys in one office. I know there's three, I think it's on this street we just came off. I know, I know what, Miller, Miller, Miller, yeah, Miller, that's his name, Miller.

Nunn: White guy, black guy?

Ware: Black guy.

Nunn: What kinda work does he do? Criminal law or ...

Ware: I just heard some people talk about him, that's it, associates.

Nunn: We got Brady Miller, Byron Miller, C. Thomas Miller, Mr. (inaudible) Miller.

Ware: Let me see the address, I think it might be Byron Miller.

Nunn: Alright, it goes from here to here, your Miller's.

Ware: O.K., where is it?

Nunn: I don't know.

Ware: West Market. Which street is this way?

Nunn: Market. The numbered streets go like this and Market crosses it.

(knock on door)

Pitcock: Be back in one second.

Ware: Steve Miller.

Nunn: Steve Miller?

Ware: Steve Miller, that, that's the guy, I'd say that's it right there. Steve Miller.

Nunn: Let me see, want me to try to holler at him?

Ware: I mean, first, ask how much he costs, you know what I'm saying? Cause I hears he's cool.

Nunn: Alright. Stephen Miller, 589–5250 or 893–7100. He thinks maybe a Steve Miller is the one he wants to holler at. So maybe.

(Pitcock returns, Nunn leaves)

Pitcock: How do you know him? I mean has he ever done anything for you or just a name you heard?

Ware: No, just a name I heard.

Pitcock: I think they're trying to reach him, he's not in the office.

Ware: Um, I just don't know man. My mother's going to kill me, gonna kill me, it's going to kill my mother.

Pitcock: Maybe you can talk to this guy and get the record set straight, you know.

Ware: This is going to kill my mother.

Pitcock: Yeah, I'm sure she won't be happy.

Ware: I know.

Pitcock: She still in Hopkinsville?

Ware: Yeah.

Pitcock: Yeah.

Ware: She's gonna kill me.

Pitcock: I'll be right back. I'm going to see what I can find out.

(Pitcock leaves, then Nunn and Pitcock enter)

Nunn: Unfortunately, he's not in the office today. They said his secretary's not in the office and I left a message on his answering machine. If he gets in anytime soon, I gave him my pager number and asked him to call us. So, that's the best I can do here. Any other suggestions or guesses?

Ware: I'll just talk, that's all, you know, just forget it.

Nunn: Here's the deal, I don't want you to just forget it cause we couldn't get a hold of one attorney. I mean, let's, if you're comfortable talking, I'm fine with that, but I need to make sure that you're fine with that.

Ware: I can always stop, right?

Nunn: Oh yeah, yeah. Like I read your rights, if you decide hey I don't want to talk no more, that's fine. And like I said, I'll just kinda lay it out again, what we know and then if you want to try and help yourself.

Nunn and Pitcock then interrogated Ware, Ware answered many of their questions, and the detectives took him to jail where he was booked.

Ware challenged the legality of nearly all of the evidence obtained in the investigation of the package, ranging from the initial search of the package to the statement he gave after he had requested an attorney. The magistrate judge conducted a suppression hearing on December 6, 2000, and the government offered the testimony of Detective Nunn and the court viewed the videotape of Ware's interrogation. In a lengthy and thorough discussion, the magistrate judge recommended that Ware's motion to suppress be denied in its entirety.

In his objections to the magistrate judge's recommendation, Ware contests the scope and legality of the warrants, the legality of the automobile stop and seizure of Ware and the package, the scope of the apartment search, and the admissibility of Ware's statements after arrest. The Court will review each issue in turn.

## II.

When reviewing a state magistrate's determination of probable cause for a search warrant, this Court must determine whether, under "the totality of the circumstances, the magistrate had a 'substantial basis' for concluding that 'a search would uncover evidence of wrongdoing.'" *United States v. Sonagere*, 30 F.3d 51, 53 (6th Cir.1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). This Court pays "great deference" to an issuing magistrate's findings, and will not set them aside unless "arbitrarily exercised." *United States v. Leake*, 998 F.2d 1359, 1363 (6th Cir.1993); *United States v. Pelham*, 801 F.2d 875, 877 (6th Cir.1986). "Deference to the [issuing] magistrate, however, is not boundless." *United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. King*, 227 F.3d 732, 739 (6th Cir.2000).

The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. These restrictions on searches bind both state and federal officials. *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Wolf v. Colorado*, 338 U.S. 25, 27–28, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). Even though at the time of the framing, the warrant requirement provided the searching officer with justification for the search and limited his trespass liability, *see, e.g.,* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 MICH. L. REV. 547, 626–27 (1999), modern courts view the warrant requirement as placing a "neutral and detached magistrate," *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), "between the police and an individual's personal privacy." *United States v. King*, 227 F.3d 732, 739 (6th Cir.2000); *see also United States v. Karo*, 468 U.S. 705, 717, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). Thus, it is the magistrate who must make an "informed and deliberate determination[ ]" regarding probable cause and issue the warrant. *Aguilar v. Texas*, 378 U.S. 108, 110, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). This requirement separates the determination of probable cause from the "actions of the police who are 'engaged in the often competitive enterprise of ferreting out crime.'" *King*, 227 F.3d at 739 (quoting *Johnson*, 333 U.S. at 14, 68 S.Ct. 367).

■ To determine whether probable cause supports the issuance of a warrant, the issuing magistrate "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Fair probability means "less than prima facie proof, but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In making this determination, "the information presented must be sufficient to allow the official to independently determine probable cause; 'his action cannot be a mere ratification of the bare conclusions of others.'" *United States v. Weaver*, 99 F.3d 1372, 1377 (1996) (quoting *Gates*, 462 U.S. at 239, 103 S.Ct. 2317). To ensure that the "abdication of the magistrate's duty does not occur," this Court must "conscientiously review the sufficiency of affidavits on which warrants are issued." *Gates*, 462 US. at 239, 103 S.Ct. 2317. This Court, as a reviewing court, examines the record to determine whether "the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* at 238–39, 103 S.Ct. 2317 (citing *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). Within this legal framework, the Court now turns to each of the contested issues.

## III.

■ Although apparently conceded by Ware in the suppression hearing, the dog sniff and subsequent search of the package did not infringe Ware's Fourth Amendment rights. Even if Ware had a recognizable privacy expectation in the in-transit package, no Fourth Amendment violation occurred because the initial detention and dog sniff of the package was neither a search nor a seizure. The brief removal of the package from the normal FedEx delivery stream did not constitute a seizure because there was no "meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *see also United States v. Gant*, 112 F.3d 239, 241 (holding that removal of bag "from overhead compartment for examination by a drug-sniffing dog constituted neither a search nor a seizure"). The dog sniff, likewise, was not a search of the package. *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

■■ The positive reaction by the drug dog can establish probable cause sufficient to obtain a warrant, so long as the officer established the training and experience of the dog. *See United States v. Berry*, 90 F.3d 148, 153 (6th Cir.1996). Here, the Nunn Warrants contained Detective Dotson's affidavit attesting to the drug dog's experience. In addition, Detective Nunn indicated on the warrant application that the package was heavily taped and originated in a source city for narcotics. This information in the affidavit—the drug dog alert, heavy taping, and package origin—was more than sufficient to support a search warrant for the package. *See United States v. Reed*, 141 F.3d 644, 650 (6th Cir.1998).

■ Because the second Nunn warrant affidavit stated this same information in addition to specifying the "length of time for which beeper surveillance is requested," the placement and monitoring of the an electronic tracking device in the package did not violate Ware's Fourth Amendment rights. *See United States v. Karo*, 468 U.S. 705, 713, 718, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984).

## IV.

Shortly after delivery of the package, the electronic tracking device indicated movement as Ware left his apartment carrying a shopping bag and drove away in his car. Ware stopped suddenly to observe if anyone was following him and then drove to a highly congested area where the detectives following him feared they could not continue to track his movements. At this point, the following detectives knew that Ware had accepted delivery of a package containing cocaine, that he then engaged in behavior consistent with police counter-surveillance both at his apartment and while driving in his vehicle, and that the electronic tracking device indicated that the package was moving when Ware left his apartment.

■ Since the triggering event in the first Nunn warrant—opening of the package—never occurred, no warrant authorized the stop of Ware. Two exceptions to the warrant requirement, however, did permit Ware's seizure. First, when police followed Ware, they had a reasonable suspicion that criminal activity was afoot. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). With that reasonable suspicion, officers may briefly stop and investigate. *United States v. Hill*, 195 F.3d 258, 263–64 (6th Cir.1999); *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir.1996). Though *Terry* applied to pedestrians, the same analysis applies to investigatory stops of vehicles. *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir.1994); Wayne R. LaFave, SEARCH AND SEIZURE § 9.4 n. 3 (1996). Here, the officers following Ware had ample suspicion that criminal activity was afoot because they knew Ware likely possessed cocaine. Thus, the initial stop did not violate Ware's Fourth Amendment rights.

■ The parties dispute the exact sequence of events following the stop of Ware at the University of Louisville. However, the Court concludes that the police acted within constitutional limits even under Ware's version of events. Ware claims that the officers removed him from the car and handcuffed him prior to locating the package. In an investigatory stop, however, officers may handcuff or restrain the individual when reasonably necessary for their own safety. *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir.1999). Because the officers reasonably suspected Ware of attempting to possess drugs in a quantity sufficient for drug trafficking, the officers could have reasonably decided that the risk that Ware would be armed was

very high and, therefore, that they should take significant precautions for their safety.

■■■■■ Shortly after the stop, Detective Nunn viewed the package containing cocaine on the back seat of the car and removed the parcel. Because probable cause likely existed to arrest Ware based on the surveillance information alone, this Court is not presented with the often difficult issue of when (or whether) a permissible *Terry* stop ripened into a full-blown arrest. Officers observed the package in plain view almost immediately upon stopping Ware. Such observation gave them probable cause to arrest Ware for possession of a controlled substance and Ware's arrest, therefore, did not violate the Fourth Amendment. *See United States v. Watson,* 423 U.S. 411, 415–18, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Detective Nunn's removal of the package from the back seat of the car likewise did not infringe Ware's Fourth Amendment protections. Viewing objects in plain view does not rise to the level of a search, so long as the "officer's access to [the] object has some prior justification under the Fourth Amendment." *Texas v. Brown,* 460 U.S. 730, 738, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Since both the *Terry* stop and the vehicle's location on a public road justified Detective Nunn's presence, his viewing of the package was not a search. He had seen the FedEx package earlier in the day and knew that it contained cocaine. Therefore, even though Detective Nunn only viewed a FedEx package in a shopping bag, for Fourth Amendment purposes, he viewed contraband. *See, e.g, Illinois v. Andreas,* 463 U.S. 765, 771–72, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) (holding that "once a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost" (footnote omitted)). His seizure of the package which he knew to contain cocaine from the vehicle was likewise proper under the automobile exception to the warrant requirement. *Maryland v. Dyson,* 527 U.S. 465, 466–67, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999); *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

The police acted within the bounds of making an investigatory stop and seizure of contraband in the passenger compartment of a vehicle. Therefore, this Court need not consider whether the exigent circumstances exception to the warrant requirement would support the stop. Even if the officers erroneously thought that exigent circumstances justified their stop and seizure of Ware, the fruits of the seizure should not be suppressed so long as the officer's actions could be justified objectively. *See, e.g., Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (affirming the general principle that courts should "first examin[e] the challenged searches under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved").

## V.

After Ware's arrest, relying on the authority of the Napier warrant, officers searched the apartment listed on the FedEx shipping label. In these circumstances, a search is only permissible when supported by an appropriate warrant. The strong Fourth Amendment protections of home privacy and the allowance for facially reasonable law enforcement activity are never easy to reconcile. The Court concludes that the state judge had

insufficient information to find probable cause for the Napier warrant.

## A.

■ The federal magistrate judge, Ware, and the United States all characterize the Napier warrant as an anticipatory warrant. Ware challenges the scope of the apartment search and the validity of all of the anticipatory search warrants. A fundamental requirement of the Court's review is first to define the warrant's terms: that is, whether it is an anticipatory warrant or a standard warrant. The answer affects the Court's analysis.

Law enforcement officers commonly employ anticipatory warrants to obtain advance approval to search upon the anticipated occurrence of specific events.[2] Unlike a standard warrant, anticipatory warrants "are not supported by probable cause to believe the items to be seized are at the place to be searched when the warrant is issued." *United States v. Loy*, 191 F.3d 360, 364 (1999); *accord United States v. Rowland*, 145 F.3d 1194, 1201 (10th Cir.1998). Instead, an anticipatory warrant specifically identifies a "triggering event," either in the warrant itself or the affidavit which will create probable cause. *United States v. Loy*, 191 F.3d 360, 364 (3rd Cir.1999). Specifying the triggering event that authorizes the search is critical, because "[i]f the triggering events do not occur, the anticipatory warrant is void." *Rowland*, 145 F.3d at 1201; *see also United States v. Vigneau*, 187 F.3d 70, 79–80 (1st Cir.1999) (holding that when anticipatory warrant stated that search would not occur until "after delivery has been made," the search did not meet the warrant requirements when

the package was merely left at the door since "delivery did nothing to establish probable cause to search the premises [because the package] was not received by anyone inside the premises").

To define the Napier warrant, therefore, this Court must examine both the warrant and affidavit in a "commonsense" manner. *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). The Napier warrant itself states "you are commanded to make *immediate* search of the premises" (emphasis added). By its clear terms, this language authorizes a standard warrant, not an anticipatory one. The warrant contains no triggering event. The warrant's express terms do not condition its validity on the delivery of the contraband. The Napier affidavit is more ambiguous. It does state that "on 02–28–2000 a controlled delivery will be attempted." However, the affidavit's declaration of an intent to deliver does not restrict the time for execution of the warrant. In fact, the affidavit is silent as to precisely when the police actually intend to execute the warrant. One might say that the Court is making a rather fine distinction. Perhaps so; however, it is essential that the Court scrutinize the warrant and the affidavit for words which limit when the search may occur. Significantly, the Court finds no expressed limitations in either the warrant or accompanying affidavit.

The Sixth Circuit's opinion in *United States v. Rey*, 923 F.2d 1217 (6th Cir.1991) provides an instructive comparison. The *Rey* affidavit contained a specific statement about the time of the search. It stated that the officers would search "sub-

---

2. Anticipatory warrants are handy and useful because officials often know that they lack probable cause to obtain a warrant to search a residence until the occurrence of an anticipated future event. Therefore, anticipatory warrants contain specific time limitations and

take "effect not upon issuance but at a specified future time." *United States v. Jackson*, 55 F.3d 1219, 1223 (6th Cir.1995) (citing *United States v. Gendron*, 18 F.3d 955, 965 (1st Cir. 1994)).

sequent to the delivery of the package." This statement connected the delivery to the search and allowed the court to make a "reasonable inference" that "the warrant authorizes a search only after the controlled delivery has occurred." *Id.* at 1221. From that specific statement, the *Rey* court said one can make a reasonable inference about the terms of the warrant itself. Neither the Napier warrant nor the accompanying affidavit, however, contains such a specific restriction. Nor do they express a temporal connection between delivery and search. Without more specific statements, one cannot make a reasonable inference that the Napier warrant only authorized a search *after* delivery. The Napier warrant and affidavit, by their terms, authorized a search even if delivery had never occurred or the package was refused by the occupants of the home. The Napier affidavit expresses only an intention to deliver, not a specific restriction on the search as in the *Rey* affidavit.

One might say that but for the absence of a single word or two the Court could find that the warrant was anticipatory. That is true. However, the Court is not free to rewrite both the warrant and the supporting affidavits to include all the necessary words. One might suggest that the Court could make a reasonable inference that the officers intended to execute the Napier warrant only after delivery of the package. However, their actual intent is not important. The scope of the warrant is. The Court cannot create a restriction where none actually exists. Some degree of specificity is necessary to create a valid anticipatory warrant to search a residence. This Court cannot say that "[i]f the controlled delivery had not occurred, then the warrant would have been void," because, unlike the *Rey* warrant and affidavit, no conditions governed or restricted execution of the Napier warrant. *Rey*, 923 F.2d at 1221. Therefore, the Court concludes that the Napier warrant was not an anticipatory warrant.[3]

### B.

Next, this Court must determine whether probable cause supported the issuance of the Napier warrant as a standard warrant. The Court does so by examining "the totality of the circumstances" and deciding whether "the magistrate had a 'substantial basis' for concluding that 'a search would uncover evidence of wrongdoing.'" *United States v. Sonagere*, 30 F.3d 51, 53 (6th Cir.1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

Information sworn to the magistrate must allow him to "make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In making the probable cause determination, "[s]ufficient infor-

---

3. Later in this Memorandum Opinion, the Court discusses whether the magistrate had probable cause to issue a standard warrant. In that analysis, the Court discusses a series of Sixth Circuit opinions concerning the execution of anticipatory warrants: *United States v. Rey*, 923 F.2d 1217 (6th Cir.1991); *United States v. Lawson*, 999 F.2d 985 (6th Cir.1993); and *United States v. Jackson*, 55 F.3d 1219 (6th Cir.1995). Those cases discuss circumstances similar to ours in which the Sixth Circuit approved execution of the anticipato-

ry warrant. It is important to understand that these cases are not relevant to the question of whether the warrant and affidavit at issue here actually create or support an anticipatory warrant. In those three cases, the magistrate actually approved an anticipatory warrant. The issue before each panel was whether officers properly executed the warrant. In our case, the Court has found that the magistrate did not issue an anticipatory warrant.

mation must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Gates,* 462 U.S. at 239, 103 S.Ct. 2317.

Detective Napier presented only the following information to the magistrate:

* another officer executed a search warrant on a FedEx parcel addressed to David Jones and found about one pound of cocaine;

* a controlled delivery of this parcel will be attempted at the address on the package label; and

* that Detective Napier's independent investigation determined that the "crisscross did not specify which apartments tenants are associated with."

Napier's affidavit was absolutely silent as to any other information, though we now know that he possessed more. The magistrate had only the Napier affidavit. The Court, therefore, must evaluate the validity of the Napier warrant on that basis. Information not shared by the warrant-seeking officer is irrelevant to the analysis. *See United States v. Davidson,* 936 F.2d 856, 859 (6th Cir.1991).

 Before issuing a warrant the magistrate must determine whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). A temporal restriction limits searches to time frames of high probability.[4] The Napier warrant contains no time restriction. Rather, it authorized an immediate search. As such, it must contain a stronger showing of probable cause to jus-

tify issuance of the warrant because the magistrate must find a "fair probability" that contraband would be found prior to any controlled delivery.

Another important factor is the focus of the search. The Napier affidavit sought to search a home, and as such, requires the highest level of probable cause to justify the search. Because the sanctity of the home from governmental intrusion is so highly guarded, police must have a valid warrant in order to search absent exigent circumstances. *See, e.g., Mincey v. Arizona,* 437 U.S. 385, 393–94, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Indeed, "the privacy of the home 'deserve[s] the most scrupulous protection from governmental invasion.'" *United States v. Morgan,* 743 F.2d 1158, 1168 (6th Cir.1984) (quoting *Oliver v. United States,* 466 U.S. 170, 178, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)). Such heightened protection of the home has been a consistent theme since the framing of the Constitution. *See United States v. United States Dist. Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (declaring that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is based"); Thomas Y. Davies, *Recovering the Original Fourth Amendment,* 98 MICH. L. REV. 547, 642–50 (1999) (stating that the "domicile was a sacrosanct interest in late eighteenth-century common law"). The Supreme Court recently reaffirmed the special status of the home in Fourth Amendment analysis, describing the "interior of homes" as the "prototypical . . . area of protected privacy." *Kyllo v. United States,* —— U.S. ——, 121 S.Ct. 2038, 2040, 150 L.Ed.2d 94 (2001).

---

**4.** Indeed, the affidavit supporting the anticipatory Nunn warrant authorizing the electronic tracking device specifically addresses such a temporal restriction by not providing search authority until the package is opened, because "the individual who accepts or receives the parcel may not be the person for whom it is ultimately intended."

This Court cannot find any analogous cases involving standard warrants based solely on the delivery of contraband. Therefore, the Court must examine the anticipatory warrant cases, remembering that the probable cause required to issue a standard warrant is greater than that required for an anticipatory warrant. In each of three recent Sixth Circuit cases reviewing anticipatory warrants, the police presented the magistrate with additional information connecting the address on the label to the possibility of finding contraband. Those cases guide the Court's assessment of the current circumstances.

In *United States v. Rey*, 923 F.2d 1217, 1220 (6th Cir.1991), the Sixth Circuit relied on the fact that "the apartment had been under surveillance and defendant Rey had been seen at the apartment on the day before the delivery." In addition, "the mail carrier for the apartment claimed a number of 'these types of packages' had been delivered to the same location in the past." *Id.* The court upheld probable cause for the warrant based upon the delivery, surveillance, the defendant being connected to the apartment, and the previous delivery of suspected drug packages to the location. *Id.* at 1220. Unquestionably, the magistrate had more evidence to support the warrant than in our case. However, the Court left unstated whether evidence of a "sure course" destination alone would support probable cause.[5]

In *United States v. Lawson*, 999 F.2d 985, 988 (6th Cir.1993), the Sixth Circuit acknowledged that "*Rey* may be read to stand for the proposition that a warrant to search an address may be based solely on the fact that a package containing illegal substances is on a 'sure course' to its destination (as in the mail)." Notwithstanding that potential reading, however, the panel clarified that the facts of neither case necessitated such a rule: "in *Rey* and the instant case there were additional facts in the magistrate's consideration of the 'totality of the circumstances.'" *Id.* The court noted the weight of the cocaine at issue (six ounces) and stated,

> The magistrate judge also knew through the affidavit that the cocaine in the package was concealed in an attempt to avoid detection. This factor makes it less likely that the defendant was "set up" by someone and more likely that the cocaine was intended to reach its destination undetected. All of the information contained in the affidavit could reasonably lead a person to conclude that

---

5. The *Rey* majority backed away from requiring these additional facts to authorize an anticipatory warrant. *Id.* at 1220 (noting that the 4th, 7th, and 9th Circuits disagreed with the holding of *United States v. Garcia*, 882 F.2d 699 (2nd Cir.1989), that an anticipatory warrant based solely on "sure course" might be overbroad).

Judge Keith, concurring in the result in *Rey*, specifically mentioned the potential harm from allowing a package label, standing alone, to provide sufficient probable cause to issue an anticipatory warrant for a home. Such a regime, Judge Keith argued, would be unconstitutional:

> The government, someone by mistake, or someone seeking to subject another to an investigation, could mail a controlled substance to a party and thereby provide

probable cause for a search or an entire residence, including an examination of all papers to determine if they are drug records, for evidence of drug activity. I do not believe those hypotheticals or other possible explanations are so rare that it is probable that if an apartment is the addressee of a controlled substance, it is reasonable for a government agent to conclude that there is probable cause to believe that there will be other evidence of illegal drug activity at the location.

*Rey*, 923 F.2d at 1225. In *Rey*, however, other information, such as surveillance and prior receipt of similar packages, reduced the likelihood of other explanations and provided probable cause for a warrant to authorize a search after the package was delivered.

an experienced trafficker in narcotics sent the package in question.

*Id.* The affidavit in *Lawson* also contained a statement by the officer of his "conclusions of what could be fairly be expected to be found" during the search based upon "his training and experience in narcotics investigations." *Id.* at 986.

Finally, in *United States v. Jackson,* 55 F.3d 1219 (6th Cir.1995), the Sixth Circuit upheld the denial of defendant's motion to suppress evidence seized with an anticipatory warrant. There, three days prior to the controlled delivery, the addressee called the package company complaining of nondelivery and gave "detailed information about the package." *Id.* at 1221. On the day of delivery, the package company spoke with the addressee to confirm delivery and an undercover officer subsequently delivered the package. The defendants challenged the validity of the warrant and the court specifically held that "once the package was taken inside the ... house, probable cause existed to search the premises not only for the contraband itself, but also for other evidence of drug trafficking." *Id.* at 1224. In other words, probable cause existed under the warrant's express terms only after the package was taken inside the home and the anticipatory warrant did not authorize a search until that occurred. At that time, the likelihood of mistake plummeted and the probability of finding contraband soared.

In all three of these anticipatory warrant cases, to uphold a search warrant the Sixth Circuit cited more than the existence of a package containing contraband with a certain address on the label. The Napier affidavit contained no more than this. It was silent as to a whole host of facts presented in the other affidavits such as: the extent of any prior surveillance; Napier's experience with narcotics investigations; specific conclusions about what might be found in the apartment; whether a "David Jones" lived in or frequented the apartment; who lived in the apartment or who might receive the package; whether FedEx had delivered other similar packages to the address; whether the apartment was vacant or occupied; or whether the area was a known drug trafficking area.

The Sixth Circuit has yet to say that "sure course" of delivery alone satisfies probable cause even for an anticipatory warrant, let alone a standard warrant. Consequently, this Court concludes that "sure course" of delivery certainly could not provide the sole basis for issuance of a broader, standard warrant. The Napier warrant presented no information about the apartment residents or any other activity associated with that location and its occupants. The complete absence of such additional information presented to the magistrate and the protected status of the home renders the Napier warrant wholly unsupported by probable cause. These foundational deficiencies are sufficiently grave for this Court to overcome its "great deference" to the magistrate's determination. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

## VI.

Even though the state judge issued the Napier warrant without probable cause, the fruits of the search are not necessarily suppressed. The exclusionary rule is designed primarily to deter police misconduct and the Supreme Court has declined to extend the rule where doing so would not further that goal. *See, e.g., United States v. Calandra,* 414 U.S. 338, 351–52, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (refusing to apply exclusionary rule to grand jury proceedings). In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court created a good faith exception to the exclu-

sionary rule and held that the fruits of a constitutionally defective search should not be suppressed unless: (1) the affidavit contained a "knowing or reckless falsity," (2) the magistrate did not act in a "neutral and detached" function or served as a "rubber stamp for police," (3) the affidavit was a "bare bones" affidavit so deficient that it did not "provide the magistrate with a substantial basis for determining the existence of probable cause," or (4) the officer's reliance on the warrant was not in good faith or objectively reasonable. *Id.* at 914–922, 104 S.Ct. 3405 (citations and quotations omitted).

In this instance, the Court's analysis of the *Leon* exceptions turns on whether the officers' reliance on the warrant was objectively reasonable and in good faith. If so, the fruits of the apartment search should not be excluded.[6] Determining the officer's good faith or objective reasonableness is not an easy assignment. The Court's inquiry must be "confined to the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances ... may be considered." *Leon,* 468 U.S. at 922 n. 23.

### A.

Everyone involved thought that the Napier warrant was an anticipatory warrant. However, an anticipatory warrant or its supporting affidavit must mention the specific triggering event. The only possible triggering event was a statement of police intentions: "on 02–08–2000 a controlled delivery will be attempted." This statement falls far short of "conditions governing execution that are explicit, clear, and narrowly drawn so as to avoid misunderstanding or manipulation by government agents." *United States v. Garcia,* 882 F.2d 699, 703–04 (2nd Cir.1989). Not only did the Napier warrant not mention any triggering event, it "commanded" the police "to make an immediate search of the premises." The absence of any triggering event and the clear authorization to search the apartment immediately renders any assumption that the Napier warrant was an anticipatory warrant not only wrong, but objectively unreasonable.[7]

Detective Napier's dual role, both applying for the warrant and searching the apartment, bolsters the Court's conclusion. Detective Napier, the author of the affidavit, took part in the search and completed the warrant return. This is unlike a situation where one officer submits a deficient affidavit, a magistrate improperly issues a warrant, and a different officer mistakenly, but reasonably, relies on the warrant to search. Here Detective Napier, as author of the affidavit, had thorough knowledge of the affidavit's contents. No question arises as to his familiarity with the contents of the affidavit.

---

6. Ware does not claim that the Napier affidavit contained a "knowing or reckless falsity" or that the magistrate served as a rubber stamp for police. Likewise, the Napier affidavit, though insufficient to support a finding of probable cause, contained more information than a "bare bones" affidavit as defined by the Sixth Circuit. *See United States v. Weaver,* 99 F.3d 1372, 1378 (6th Cir.1996) (describing a bare bones affidavit as one that states "conclusions, without providing some underlying factual circumstances").

7. Here, Detective Napier knew or had access to significant information that significantly increased the likelihood that this package was sent deliberately but he did not include such information in the affidavit. Had he listed in the affidavit that the cocaine was concealed, the package was heavily taped, and the label was hand addressed from an area known for narcotics trafficking, as Detective Nunn did in the Nunn warrants, then the magistrate would have undoubtedly had sufficient information to issue an anticipatory search warrant for the apartment.

B.

 Whether it was objectively reasonable to believe that the affidavit supported the issuance of the Napier warrant as a standard warrant presents a slightly different issue. The supporting affidavit fell far short of providing the necessary information which the Sixth Circuit has used to find probable cause. Detective Napier did not identify any evidence that linked the apartment with the cocaine other than the address label. In a sense, the address label was similar to an anonymous (as the police make no claim they know the sender of the package) but corroborated tip that a package containing cocaine would arrive at the apartment. Regardless of the veracity of the informant regarding the *package*, the affidavit omitted any corroborating information linking the package to the *apartment*.

In a similar situation, the Sixth Circuit found that such absolute absence of corroboration precluded application of the *Leon* good faith exception. *See United States v. Leake*, 998 F.2d 1359, 1366–67 (6th Cir.1993). In *Leake*, an anonymous informant reported seeing large amounts of marijuana in the basement of a house where he was working as a tradesman. *Id.* at 1361. The informant stated that he concluded the residents of the home were selling marijuana, as the quantity far exceeded the amount usually used for personal use. *Id.* at 1362. The officer who received the call then tried to corroborate the information. He conducted surveillance on the home identified for two consecutive evenings where he observed "nothing unusual." *Id.* at 1361. The officer also "confirmed the address of the house, observed that it matched the description given by the anonymous caller, and noted that the house had a basement as the caller had said." *Id.* The officer also recorded the license plates of the vehicles to determine likely residents of the home. *Id.*

The Sixth Circuit found "two principal problems with the warrant." *Id.* at 1365. First, the information in the tip was not "rich in relevant detail" because it did not identify the residents by name or the dates that the marijuana was observed nor did it describe any future activity. *Id.* (quotation omitted). Second, the officer's "corroboration of information provided by the caller was simply insufficient." *Id.* This lack of corroboration was so important, that "[j]udged on objective criteria, a reasonably well-trained officer 'would have known that the search was illegal despite the magistrate's authorization.'" *Id.* at 1367 (quoting *Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. 3405). Like *Leake*, no corroborating evidence of any kind made its way into the Napier affidavit. Like *Leake*, the good faith exception of *Leon* does not save the fruits of this search from the exclusionary rule.

Thus, even though the officers actually possessed more than enough information to support the issuance of an anticipatory warrant, this Court cannot overlook the magistrate's mistake granting a broader standard warrant or the officers mistaken assumption of the warrant's validity.

C.

The Court has considered these issues from several perspectives. For instance, the Court notes that the officers did delay their search until after delivery and acceptance of the package. Therefore, had the warrant been an anticipatory warrant, their search would have been valid. Likewise, had the officers sought a standard warrant after delivery and acceptance of the package, a state judge could properly have issued one. None of these possibilities can change the Court's analysis or conclusions because, in fact, the officers did not pursue either of these options.

■ The exclusionary rule is intended to ensure that the police actually comply with the proper procedures for obtaining a search warrant. *See United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Its purpose is not to punish the individual officer for a perhaps inadvertent transgression but, rather, to give legitimacy to our constitutional protections by systematically deterring unlawful behavior. *See, e.g.,* Potter Stewart, *The Road to Mapp v. Ohio and Beyond,* 83 COLUM. L. REV. 1365, 1400 (1983). Maintaining that deterrence is no less important today. The Court's decision is consistent, therefore, with the overarching purposes of the exclusionary rule.

To admit the fruits of a search based on an illegal warrant merely because the officers executed the warrant as if it were properly issued would undercut the whole regime requiring independent magistrate authorization. It "would effectively abrogate the role of the neutral magistrate in determining when probable cause exists." *United States v. Bowling,* 900 F.2d 926, 933 (6th Cir.1990); *see also* Thomas Y. Davies, *Recovering the Original Fourth Amendment,* 98 MICH. L. REV. 547, 724 (1999) (arguing that the Fourth Amendment's "ban on too-loose warrants served to reaffirm the common law's general resistance to conferring discretionary authority on ordinary officers"). The *Bowling* court continued,

> The Supreme Court has emphatically cautioned that in the absence of urgent circumstances officers should not rely on their own discretion, but should instead resort to a neutral magistrate, to determine whether probable cause to conduct a search exists. *See Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) ("when the right of

privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent"). Although *Johnson*'s admonition speaks specifically to the situation in which officers conduct a *warrantless* search, we think it is equally applicable to cases in which officers possess a warrant but are alerted to circumstances which affect the probable cause for its execution.

*Bowling,* 900 F.2d at 933. As in *Bowling,* the Napier warrant gave the officers broad discretion. Suppressing evidence in cases such as this forces the officers to fully disclose their basis for requesting a warrant so that the magistrate may make the independent determination of probable cause that the law requires. *Franks v. Delaware,* 438 U.S. 154, 165, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). This concern of full disclosure is heightened when the subject of the search is the home because the Fourth Amendment protects against illegal searches of the home first and foremost. *See United States v. Morgan,* 743 F.2d 1158, 1168 (6th Cir.1984).

In sum, the sheer absence of corroborating information in the affidavit supporting the Napier warrant coupled with the breadth of the warrant itself renders reliance on the warrant objectively unreasonable and, therefore, fruits of the search will be excluded. Because the officers had information sufficient to support a more narrowly drafted warrant that they did not share with the magistrate, suppression is further justified to encourage police compliance with the clear mandates of the Fourth Amendment.[8]

---

8. Because this Court finds the Napier warrant unsupported by probable cause and the fruits of the search inadmissible under *Leon,* this Court need not consider whether the officers exceeded the scope of the Napier warrant in their search.

## VII.

 The Supreme Court recently summarized the clear rule governing the procedure that must be followed when a criminal suspect in custody asserts their right to counsel:

> Once a suspect asserts the right [to counsel], not only must the current interrogation cease, but he may not be approached for further interrogation until counsel has been made available to him.... If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.

*McNeil v. Wisconsin*, 501 U.S. 171, 176–77, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (quotations and citations omitted). Once again, these circumstances place law enforcement officials in difficult positions. Even some seemingly innocent conversations leading to incriminating statements cannot be admitted under current law.

Here, Ware requested a lawyer, Steve Miller, and Detective Nunn left to call the lawyer. While Detective Nunn was gone, Detective Pitcock continued the interrogation, perhaps innocently enough. He asked Ware how he knew Mr. Miller and the whereabouts of Ware's mother. When Detective Nunn returned and stated that he had done the best that he could do, he asked Ware if "he had any other suggestions or guesses." Ware then answered that he would "just talk," and Detective Nunn carefully reviewed the importance of that decision with Ware. By any measure, the officers' conduct was reasonable and certainly not abusive.

Notwithstanding Detective Nunn's care, the Supreme Court has made very clear that no matter how carefully and thoroughly he reviewed Ware's attempted waiver of his previously invoked right to counsel, if the police initiated the encounter any subsequent statements are absolutely inadmissible as substantive evidence. *See Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The government's argument that Ware initiated the conversation regarding waiver of his right to counsel strips the "bright line" *Edwards* rule of the very certainty it creates. *See Davis v. United States*, 512 U.S. 452, 458–59, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Arizona v. Roberson*, 486 U.S. 675, 681, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). Here, Ware answered a question posed by a detective in the same custodial interrogation after he had requested an attorney. An answer to a question from a custodial officer, regardless of any linguistic gymnastics, simply cannot initiate "communication, exchanges, or conversations." *See Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880.

Where a definitive break occurs in custody, police may more easily accept the suspect's reconsideration and waiver of his right to counsel. *See, e.g., Kyger v. Carlton*, 146 F.3d 374, 379–81 (6th Cir.1998) (stating that "[t]he concern of *Edwards* ... simply is not implicated when a suspect is not in continuous custody"). Thus, had such a break in custody occurred here, the result might be different. However, careful review of the interrogation confirms that the officers, perhaps innocently enough, continued their conversation with Ware. Under these circumstances, one can reach no conclusion other than Defendant's incriminating statements occurred in the same custodial interrogation as his initial request for counsel.

For these reasons, Ware's custodial statement will be suppressed.

## ORDER

Defendant Ware has filed objections to Magistrate Gambill's Proposed Findings of Fact and Conclusions of Law resolving Ware's motion for suppression.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motion for suppression is GRANTED IN PART and DENIED IN PART. The motion for suppression is DENIED with regards to the fruits of the package search and automobile stop. The motion for suppression is GRANTED with regards to the fruits of the apartment search and Defendant Ware's custodial statements.