**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Delbert BOWLING (89–5595), and Idell Bowling (89–5618),
Defendants–Appellants.**

**Nos. 89–5595, 89–5618.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 5, 1990.

Decided April 9, 1990.

---

Louis DeFalaise, U.S. Atty., R. Michael Murphy, Asst. U.S. Atty., Lexington, Ky., Frederick A. Stine, V, Asst. U.S. Atty. (Argued), Office of the U.S. Atty., Covington, Ky., for U.S.

William D. Stark, Jr. (Argued), Barbourville, Ky., for Delbert Bowling.

Samuel E. Begley (Argued), London, Ky., Barbara C. Carnes, Corbin, Ky., for Idell Bowling.

* Honorable Carl B. Rubin, District Judge, United States District Court for the Southern District of Ohio, sitting by designation. Judge Rubin's term as Chief District Judge ended March 15, 1990.

Before JONES and MILBURN, Circuit Judges, and RUBIN, District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Delbert and Idell Bowling appeal the district court's denial of their motions to suppress evidence seized during a search of their trailer. Delbert Bowling also appeals the district court's admission into evidence of certain contraband seized during the search and the court's refusal to allow jurors to testify regarding alleged juror misconduct. We affirm in all respects, but we uphold the district court's denial of the Bowlings' motions to suppress on grounds different than those expressed by the district court.

I.

The facts are largely uncontested. On August 24, 1988, agents of the United States Forest Service entered the Arnett Fork area of Clay County, Kentucky, for the purpose of eradicating two marijuana plots located on property of the United States Forest Service. Marilyn Colwell and William Earls were found near the marijuana, and after a brief stand-off with Forest Service officers, both individuals surrendered to the officials. During post-arrest interrogation, Earls and Colwell revealed that the plots belonged to defendants-appellants Delbert and Idell Bowling. Forest Service officers also discovered that a path led from the marijuana patches to a trailer owned by the Bowlings. Based on Earls and Colwell's information and the discovery of the path between the Bowlings' trailer and the marijuana patches, Forest Service officers went to the office of the Clay County Sheriff, Harold Sizemore, to obtain assistance in securing a warrant to search the Bowlings' trailer.

Forest Service officers remaining on the site near the Bowlings' trailer were advised that a search warrant was in the process of being obtained. While awaiting the warrant, Officer Bobby Dees engaged Delbert

Bowling in a conversation during which he informed Mr. Bowling that a warrant to search his trailer was being obtained. Mr. Bowling immediately advised Dees that he could search the trailer without a warrant. After obtaining Delbert Bowling's consent, Dees called for the assistance of another officer, Dennis Whitehead, who was also at the site. According to the testimony of Mr. Bowling, Dees also "got on the radio and talked to somebody and told them that he was going to go on in and search the trailer, told them to bring the warrant on." J.App. at 151.

The central factual dispute between the Bowlings and the government concerns the thoroughness of the consent search conducted by Officers Dees and Whitehead. Mr. Bowling accompanied the officers during the search. Although Officers Dees and Whitehead testified at the suppression hearing that they searched every room of the trailer, Whitehead maintained that the only room examined in detail was the bedroom. *Id.* at 88. He added, however, that a detailed search was made of a green knapsack and that drawers were pulled out. *Id.* Dees characterized the inspection of the trailer as "a very quick search" in which he and Officer Whitehead "[m]ade a visual look in a closet, in a bedroom." He further testified that "there was a duffel bag [in the bedroom], we opened it, it had some wet camouflage clothes and some other articles in it; [we went] back through the living room area, opened some cabinets in the kitchen and looked in." *Id.* at 140. The consent search lasted approximately fifteen minutes. *Id.* at 90. No incriminating evidence was found linking the Bowlings to the marijuana plots.

After the consent search, the Bowlings departed from their trailer. Approximately two hours later on August 24, Sheriff Sizemore, his deputies and federal officers arrived at the Bowlings' trailer with a search warrant issued by a state court judge. Having ascertained that no one was at home, Sheriff Sizemore read the search warrant to the trailer's rear door. At the time of this act, Officer Dees was nearby, and after the officers had entered the trailer, Dees informed Sheriff Sizemore and his

aides that he and Officer Whitehead had made "a preliminary search of the trailer." *Id.* at 143.

Sheriff Sizemore and accompanying officers proceeded with a second search of the trailer pursuant to the search warrant. The judge who issued the search warrant was not apprised that a consent search had already been conducted, and it is disputed whether the search warrant affiant or anyone else who participated in securing the warrant was informed about the consent search during the process of obtaining the warrant. The second search of the Bowlings' trailer produced several incriminating items, including ammunition, plant food, marijuana, marijuana residue, camping items, and two issues of *High Times* magazine. The search warrant also authorized the search of an automobile located behind the trailer in which authorities found a bottle of marijuana seeds.

On September 7, 1988, a grand jury for the Eastern District of Kentucky returned a four-count indictment against the Bowlings. Also charged in the indictment were William Earls and Marilyn Colwell. Count one of the indictment charged all four defendants with conspiracy to produce, manufacture, and possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846 (1982). Count two charged all defendants with production, manufacture, and possession of marijuana, in violation of 21 U.S.C. § 841(a)(1). Count three of the indictment charged the Bowlings with production, manufacture and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1). Count four of the indictment charged Earls with possession and use of a firearm during a drug trafficking crime, aided and abetted by the Bowlings.

On January 12, 1989, Delbert Bowling filed a Motion to Suppress Evidence, which was joined in later by Idell Bowling. At the hearing on their motions to suppress the evidence found during the second search, the Bowlings argued that the second search was illegal because the consent search performed a few hours before it eliminated probable cause to issue a war-

rant. The district court held that under *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), as long as the officers who obtained the warrant were unaware at the time of the warrant's issuance that a prior consent search had been performed, the officers had a right to execute the warrant. Accordingly, "the intent of the initial search" had no bearing on the validity of the second search. J.App. at 163.

At trial, the Bowlings unsuccessfully objected to the introduction of many of the materials obtained during the second search on the ground that the items seized were probative primarily of the Bowlings' personal use of marijuana and not its production and manufacture, as charged in the indictment. Following the close of evidence at trial on March 1, 1989, a jury found Idell Bowling guilty of counts one through three and found Delbert Bowling guilty of all four counts. William Earls pled guilty to count two of the indictment, and the remaining charges against him were dismissed. All charges against Marilyn Colwell were dismissed. Delbert Bowling was sentenced to 112 months incarceration, while Idell Bowling was sentenced to seventy months.

After the trial's conclusion, counsel for Delbert Bowling learned from discussion with two individuals who were seated outside the courtroom during a recess of the Bowlings' trial that jurors had been discussing the Bowlings' case in the corridors of the courtroom. The two individuls who informed Mr. Bowling's counsel of these discussions, Walter and Paula Ayteo, had testified for Mr. Bowling during the trial. Counsel for Delbert Bowling filed a motion for a new trial or a hearing. It was adduced at a subsequent hearing that during a recess in the Bowlings' trial, a female juror made comments in the presence of other jurors which, according to Mr. Bowling's counsel, implied that she had already determined that Mr. Bowling was guilty. The comment allegedly made was: "He's all bullshit" or "It's all bullshit." One or more other female jurors reportedly laughed at the remark. Neither these jurors nor Walter and Paula Ayteo informed the court of this incident during the trial. In addition to arguing that the remark revealed that the juror had determined guilt prematurely, counsel for Mr. Bowling contended that the juror also violated the court's admonition not to discuss the case with other jurors. The district court denied Mr. Bowling's request to allow jurors to testify regarding the incident and held that since the juror's remark was ambiguous insofar as the subject being discussed was unclear, a new trial was not warranted. *Id.* at 64–65. This timely appeal has followed.

## II.

When reviewing a district court's determination that probable cause existed to issue a search warrant, an appellate court employs a deferential standard and seeks to determine whether "the facts and circumstances described in the affidavit indicate a 'fair probability' that evidence of a crime will be located on the premises of the proposed search." *United States v. Algie*, 721 F.2d 1039, 1041 (6th Cir.1983) (per curiam) (citations omitted). However, the Bowlings do not attack the facial sufficiency of the search warrant affidavit. Rather, they raise the question of whether the officers reasonably and in good faith relied on the search warrant, as required by *Leon*. We review such questions *de novo*. *United States v. Maggitt*, 778 F.2d 1029, 1033–35 (5th Cir.1985) (good faith treated as question of law), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2920, 91 L.Ed.2d 548 (1986); *United States v. Sager*, 743 F.2d 1261, 1265 (8th Cir.1984) (good faith "more akin" to legal question), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985); *United States v. Hendricks*, 743 F.2d 653, 656 (9th Cir.1984) (mixed question of fact and law), *cert. denied*, 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 382 (1985).

The Bowlings argue on appeal that the second search of their trailer home pursuant to the warrant violated the Fourth Amendment to the United States Constitution because Officers Dees and Whitehead had already performed a fruitless consent search a few hours before the search pur-

suant to the warrant.[1] They urge that the second search of their trailer was not made in good faith reliance on the search warrant because the officers performing that search were informed of the prior consent search before the warrant was executed. The government, on the other hand, frames the issue before us as follows: "whether the judge issuing the warrant or the officers obtaining it had any knowledge that a fruitless initial search had already been conducted by other officers." Brief for Plaintiff–Appellee at 7. From the government's standpoint, the time relevant to a determination of whether the second search was made in good faith is the point at which the warrant was obtained. The revelation after the issuance of the warrant that a fruitless consent search had already been conducted did not affect the probable cause for the second search or render its execution violative of Leon.

In Leon, the Supreme Court held that where officers rely in an objectively reasonable fashion on a search warrant issued by a neutral magistrate that is subsequently found to be invalid, the Fourth Amendment exclusionary rule does not require suppression of the fruits of the search. 468 U.S. at 905, 104 S.Ct. at 3411. Leon's good faith inquiry "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances ... may be considered." Id. at 922–23 n. 23, 104 S.Ct. at 3420 n. 23 (emphasis added).

In the instant case, the district court agreed with the government's contention that because neither the magistrate nor the officers obtaining the warrant knew at the time of the warrant's issuance that a fruitless consent search had been conducted, bad faith cannot be inferred from the officers' execution of the warrant. The district court found that absent an intentionally misleading statement to the magistrate,

or a showing that the search warrant affiant should have known but recklessly disregarded certain information, see Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the initial search had no bearing on a determination of the second search's validity. J.App. at 162–63. We believe that the district court erred in two respects. First, in light of language in Leon instructing courts to view "all of the circumstances" and to ascertain whether an officer acted in good faith "despite the magistrate's authorization," the district court misstated the law in holding that "once the state judge issued [the warrant], the agents had a right to depend upon it under the Leon case." Id. at 163. Second, the district court erred by failing to consider the conduct of all officers involved in the search—both those who obtained the search warrant and those who remained behind and conducted a consent search with knowledge that a warrant was being obtained. We discuss each error in turn.

A line of cases interpreting Fed.R. Crim.P. 41(c) and (d) (ten day time limit for executing search warrant), evidences a strong concern that probable cause may dissipate between the time of a warrant's issuance and its execution. See, e.g., United States v. Lemmons, 527 F.2d 662, 664 (6th Cir.1975), cert. denied, 429 U.S. 817, 97 S.Ct. 60, 50 L.Ed.2d 77 (1976); United States v. Wilson, 491 F.2d 724, 725 (6th Cir.1974) (per curiam), cert. denied, 426 U.S. 907, 96 S.Ct. 2228, 48 L.Ed.2d 831 (1976). See also United States v. Whitworth, 856 F.2d 1268, 1281–82 (9th Cir. 1988), cert. denied, — U.S. ——, 109 S.Ct. 1541, 103 L.Ed.2d 846 (1984). Although the Bowlings do not challenge the government's second search under Fed.R.Crim.P. 41(c) and (d), the language of cases concerning such challenges is pertinent to the case before us. In Lemmons, a challenge was brought against a search warrant that was executed five days after its issuance. This court found that probable cause still

---

1. The Fourth Amendment provides: "The right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

existed to conduct the search because the warrant was executed within ten days as required by Fed.R.Crim.P. 41(c) and *"because there is nothing in the record to indicate that the circumstances related in the agent's affidavit affording probable cause for the issuance of the search warrant had changed before it was executed." Id.* 527 F.2d at 664 (emphasis added). We made a similar finding of "continuing probable cause" in rejecting a Rule 41(c) challenge to a warrant in *Wilson,* 491 F.2d at 725. *See also United States v. Dunnings,* 425 F.2d 836, 841 (2d Cir.1969) (officers' search pursuant to a warrant valid "so long as they did execute it within 10 days *and at a time when the probable cause recited in the affidavit continued"*), *cert. denied,* 397 U.S. 1002, 90 S.Ct. 1149, 25 L.Ed.2d 412 (1970) (emphasis added); *United States v. Nepstead,* 424 F.2d 269, 271 (9th Cir.1970) ("it is also necessary that search warrants be executed with some promptness in order to lessen the possibility that the facts upon which probable cause was initially based do not become dissipated"), *cert. denied,* 400 U.S. 848, 91 S.Ct. 50, 27 L.Ed.2d 86 (1970).

Closely related to our concern regarding continuing probable cause is our disfavor of repeated searches of the same premises where the same set of facts constitute the probable cause for each search. In *Filippelli v. United States,* 6 F.2d 121, 125 (9th Cir.1925), a second search of the same premises was held illegal when there was no new indicia of probable cause which did not exist as a basis for the first search. Police in *Filippelli* obtained a warrant on October 25, 1923 based on an affidavit alleging illegal sales of alcohol occurring on October 9, 1923. The search warrant was executed and returned on its date of issue, October 25. On November 5, 1923, a second search warrant was issued which authorized the search of the same premises and which was based on illegal sales of alcohol occurring on October 17, 1923. The court found that since "no search warrant was applied for because of the first sale until after the second sale was made ... the two sales would ... justify but a single search." *Id.* In so holding, the court noted "[t]he practice of procuring successive search warrants and making repeated searches of private dwellings, based on sales antedating the first search, cannot be sanctioned or tolerated." *Id.*

 Collectively, the above authorities suggest that where an initial fruitless consent search dissipates the probable cause that justified a warrant, new indicia of probable cause must exist to repeat a search of the same premises pursuant to the warrant. We agree with this proposition and therefore reject the district court's reasoning that gives primacy to the time of the warrant's issuance over the time of its execution. The law is clear that probable cause must exist at both points in time. Where officers become aware after a warrant's issuance that a fruitless consent search has been conducted, the officers' knowledge of such an event is relevant to a determination of whether they relied on the warrant in good faith. *Cf. Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 1017, 94 L.Ed.2d 72 (1987) (validity of a warrant and the reasonableness with which it is executed raise two separate grounds on which to find a violation of the Fourth Amendment).

 It is not dispositive of the good faith inquiry that the officers obtaining the warrant in the instant case did not know at the time of the warrant's issuance that a fruitless consent search had been performed. *Leon* counsels that we evaluate the objective reasonableness of *all* officers actively involved in the entire search warrant process, not merely those who obtained the search warrant:

References to 'officer' throughout this opinion should not be read too narrowly. It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination. Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a 'bare bones' affidavit and then rely on colleagues who

are ignorant of the circumstances under which the warrant was obtained to conduct the search.

468 U.S. at 923 n. 24, 104 S.Ct. at 3420 n. 24.

■ By the time Sheriff Sizemore arrived at the Bowlings' trailer and began reading the warrant to its rear door, Officer Dees was also at or near the trailer. Although there was apparently some lag time between the commencement of the second search and Officer Dees' informing Sheriff Sizemore of the prior consent search, the lapse in time was very brief. J.App. at 143. Once inside the trailer, Officer Dees informed the officers who were conducting the second search that he and Officer Whitehead had already made "a preliminary search of the trailer." *Id.* Under these circumstances, knowledge of the prior consent search may fairly be imputed to all officers involved.

The government argues that Officer Dees' characterization of the prior consent search as "preliminary" and "very quick" should matter to the outcome of this case. However, our giving such deference to the officer's judgment would effectively abrogate the role of the neutral magistrate in determining when probable cause exists. In the absence of exigent circumstances, Officer Dees' description to Sheriff Sizemore of the prior consent search as "preliminary" should not have constituted a license to proceed with a search whose continuing probable cause was at the very least questionable. "[I]t is the magistrate who must determine independently whether there is probable cause." *Franks,* 438 U.S. at 165, 98 S.Ct. at 2681. The Supreme Court has emphatically cautioned that in the absence of urgent circumstances officers should not rely on their own discretion, but should instead resort to a neutral magistrate, to determine whether probable cause to conduct a search exists. *See Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) ("when the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent"). Although *Johnson*'s admonition speaks specifically to the situation in which officers conduct a *warrantless* search, we think it is equally applicable to cases in which officers possess a warrant but are alerted to circumstances which affect the probable cause for its execution. The Fourth Amendment's protection against unreasonable searches and seizures would be an incomplete and highly manipulable safeguard if a neutral magistrate could not play the same impartial role in assessing continuing probable cause that he plays in determining probable cause to issue the warrant in the first place. Because no exigent circumstances are presented by the facts of this case, the officers should have refrained from the second search until a neutral magistrate determined that probable cause continued to exist. Notwithstanding the officers' failure to do this, the fruits of the second search are not to be suppressed if this court finds that a netural magistrate would have determined that probable cause existed to conduct a second search despite prior fruitless consent search. *Cf. Franks,* 438 U.S. at 171–72, 98 S.Ct. at 2684–85 (where officers alleged falsity or recklessly disregarded the truth in a warrant affidavit, the fruits of their search will not be suppressed "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause ...").

The government advances a curious, and ultimately unpersuasive, argument urging that probable cause continued to exist at the time of the search warrant's execution. Relying on *Whitworth,* 856 F.2d 1268, the government argues that consent searches by their nature are not conducive to a thorough examination of a premises because the person giving consent may withdraw it at any point in time. Thus, the fact that the first search was a consent search should dispel any contention that the second search was not needed. In *Whitworth,* the defendant was asked by police officials for consent to search his trailer but refused. The defendant subsequently consented to a search of his trailer. The Ninth

Circuit concluded that in light of Whitworth's initial refusal to consent, the police conducting the search were probably working under time constraints for fear that Whitworth would withdraw his permission. The court also noted that Whitworth admitted at his suppression hearing that the consent search was not thorough. Accordingly, the court held that probable cause existed to perform a second search pursuant to a warrant.

Unlike *Whitworth,* however, the Bowlings willingly consented to a search of the trailer without even being asked. Although divergent adjectives have been used to describe the thoroughness of the consent search, it is clear that every room was searched and drawers and bags were opened. Thus, although there was a theoretical possibility that the Bowlings could have withdrawn consent, the fact that the initial search was performed under the Bowlings' consent did not in itself render Officers Dees and Whitehead's investigation unthorough. We therefore decline to base our determination of good faith on whether the first search was conducted by consent or under warrant. The relevant inquiry is whether the first search was so broad as to dissipate probable cause for the second. If it was, and if knowledge of the initial fruitless search may fairly be imputed to those officers conducting the second search, bad faith may be inferred and the evidence must be suppressed.

Applying the above standard, we decline to suppress the second search's fruits because we believe that even if a neutral magistrate were apprised of the prior fruitless consent search, probable cause for a second search would still have existed. Two facts sway us to this conclusion. First, although Officers Dees and Whitehead's search spanned every room and was detailed at points, it was not overall as intricate as the search under the warrant. This is evidenced by the fact that it lasted only fifteen minutes or so. Second, a principal incriminating item, the marijuana seeds, was found in the car located behind the trailer. This car was not searched during the consent search. Thus, although we

hold that police officers may not take the probable cause determination into their own hands when presented with non-exigent circumstances such as the ones in this case, the consent search here was not so broad as to dissipate probable cause or imply bad faith. We therefore affirm the denial of suppression.

### III.

Only Delbert Bowling appeals the district court's admission into evidence of the plant food, marijuana, marijuana residue, two issues of *High Times* magazine, camping gear, and the marijuana seeds. He argues that because these items related primarily to the personal use of marijuana rather than its production and manufacture, their admission was unfairly prejudicial. We review the district court's evidentiary rulings for abuse of discretion. *Martin v. Weaver,* 666 F.2d 1013, 1020 (6th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982) ("Absent an abuse of discretion, a reviewing court may not disturb the judgment of the district court respecting the introduction, presentation or exclusion of evidence ..."). Fed.R.Evid. 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We are not convinced that the admission into evidence of the above times was unfairly prejudicial. Obviously, the plant food found could have been used to cultivate and grow marijuana. The marijuana residue found behind the refrigerator and in the living room was evidence that the Bowlings were "stripping" marijuana plants in the trailer. J.App. at 269–70. The seeds, of course, are direct evidence of marijuana's manufacture and production. The camping items link the Bowlings to the campsite found near the marijuana patches. Finally, as Sheriff Sizemore testified, *"High Times* is a magazine dealing with pot, marijuana, the growth, cultivation of

it, and discusses different types of marijuana and other drugs." *Id.* at 240. In light of the foregoing, we affirm the district court's admission of this evidence.

## IV.

 Delbert Bowling also appeals the district court's refusal to allow a hearing at which jurors would testify regarding alleged negative and inappropriate comments made by a member of the jury. Mr. Bowling seeks a new trial as a remedy because the lapse of time has negated the value of questioning the jurors regarding the alleged misconduct. A trial court's denial of motion for a new trial based on juror misconduct is reviewed pursuant to an abuse of discretion standard. *United States v. Van Dyke,* 605 F.2d 220, 229 (6th Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979). The defendant must show that the juror misconduct resulted in prejudice to his defense in order to be afforded a new trial. *Id.* Similarly, the abuse of discretion standard governs the district court's refusal to allow jurors to testify regarding alleged misconduct. *See United States v. Soulard,* 730 F.2d 1292, 1305 (9th Cir.1984) ("Our review ultimately is limited to determining whether the district court, in view of all the circumstances, so abused its discretion that [the defendant] must be deemed to have been deprived of his Fifth Amendment due-process or Sixth Amendment impartial-jury guarantees").

Fed.R.Evid. 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon the juror.

 Mr. Bowling cannot claim that the district court's refusal to allow juror testimony regarding its alleged misconduct impaired his Sixth Amendment right to an impartial jury. In *Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), the Supreme Court explained that establishing such a claim is a difficult task in light of the many constitutional safeguards available to a defendant. It observed that a defendant's right to an impartial jury is protected by numerous aspects of the trial process, including *voir dire;* observation by the court, court personnel and counsel; and evidentiary hearings at which non-jurors are permitted to testify regarding their observations of juror misconduct. *Id.* at 126–27, 107 S.Ct. at 2750–51. While the latter safeguards may not be foolproof, the facts presented by Mr. Bowling do not suggest that they failed in the instant case. An evidentiary hearing was held during which Mr. Bowling's non-juror witnesses could only testify that they heard a juror state "It's all bullshit" or "He's all bullshit," and heard other jurors respond with laughter. Mr. Bowling did not show that these statements referred specifically to him or if they related to the trial at all. Given this degree of ambiguity, we decline to disturb "the near universal and firmly established" prohibition against allowing jurors to testify regarding their verdict or the internal influences which informed it. *See id.* at 117, 107 S.Ct. at 2746.

## V.

For the foregoing reasons, the district court's rulings are AFFIRMED.